# EXHIBIT A

THE BALTIC AND INTERNATIONAL MARITIME CONFERENCE
UNIFORM TIME CHARTER PARTY FOR OFFSHORE SERVICE VESSELS
CODE NAME: "SUPPLYTIME"

PART I

| | |
|---|---|
| 1. Place and date<br>PARIS, 24th of JUNE 1987 | |
| 2. Owners/Disponent Owners/Place of business<br>IFREMER, hereafter called the OWNERS or IFREMER<br>66, avenue d'IENA<br>75116 - PARIS | 3. Charterers/Place of business<br>OCEANIC RESEARCH AND EXPLORATION LTD<br>28, IRISH TOWN<br>GIBRALTAR. |
| 4. Vessel's name<br>NADIR SURFACE VESSEL together with<br>- NAUTILE SUBMERSIBLE (-6000 m)<br>- ROBIN (ROV)<br>- NAVIS (Positioning System) | 5. Date of delivery (Cl. 2(A))<br>8th JULY 1987<br>6. Cancelling date (Cl. 2(A))<br>NOT APPLICABLE |
| 7. Port or place of delivery (Cl. 2(A))<br>TOULON LA SEYNE (FRANCE) | 8. Port or place of re-delivery (Cl. 8(A))<br>FORT DE FRANCE (MARTINIQUE) |
| 9. Period of hire (Cl. 1(A))<br>54 days | 10. Extension of period of hire (optional) (Cl. 1(B))<br>17 days with a prior written notice given to IFREMER by August 10, 1987 |
| 11. Trading limits (Cl. 3(A))<br>NORTH ATLANTIC OCEAN AND WESTERN MEDITERRANEAN SEA | |
| 12. Employment of vessel restricted to (state nature of service(s)) (Cl. 3(A))<br>DIVING ON HMS TITANIC TO PROMOTE THE SURVEY OF THE WRECK AND TO RECOVER OBJECTS OF THE TITANIC | |
| 13. Charter hire (Cl. 7(A))<br>SEE ARTICLE 24 | 14. Hire payment (state currency, mode and place of payment; also beneficiary and bank account) (Cl. 7(A))<br>French francs ; irrevocable letter of credit in favour of IFREMER<br>Crédit Lyonnais, Agence Ligne ENTREPRISES<br>75008 - PARIS, 55 CHAMPS ELYSEES<br>ACCOUNT N° 2335 A |
| 15. Mobilisation charge (lump sum) (Cl. 2(B))<br>included | 16. Port or place of delivery (Mobilisation) (Cl. 2(B))<br>TOULON (LA SEYNE) FRANCE |
| 17. Demobilisation charge (lump sum) (Cl. 8(B))<br>included | 18. Number of days' notice of re-delivery (Cl. 8(C))<br>not applicable ; see box 10 |
| 19. Early termination of charter (state number of months' hire payable) (Cl. 8(D))<br>NOT APPLICABLE | 20. Number of months' notice of early termination (Cl. 8(D))<br>NOT APPLICABLE |
| 21. Meals (state rate agreed) (Cl. 9(I))<br>Free of charge | 22. Passenger accommodation (state rate agreed) (Cl. 9(I))<br>Free of charge |
| 23. Port or place of drydocking (Cl. 11(C))<br>IRRELEVANT | 24. War (only to be filled in if Sub-Clause (C) agreed) (Cl. 22)<br>SEE ARTICLE 13 |
| 25. Sub-let (state amount of daily increment to charter hire) (Cl. 20(B))<br>SEE ARTICLE 12 | 26. Place of arbitration (only to be filled in if place other than London agreed) (Cl. 27)<br>LONDON |
| 27. Numbers of additional clauses covering special provisions, if agreed<br>1 to 24 | |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in the Charter consisting of Part I, including additional clauses, if any agreed and stated in Box 27, and Part II as well as Appendix A and Appendix B as annexed to this Charter. In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II and Appendix A and Appendix B. and any other document incorporated by reference herein. In the event of a conflict of conditions the provisions of Part I shall prevail over those of part II and Appendix A and Appendix B.

Council of British Shipping, London

and International Maritime Conference (BIMCO), Copenhagen. Issued December 1975.

PART II

# "SUPPLYTIME" Uniform Time Charter Party for Offshore Service Vessels

1. Period

(A) The Owners let and the Charterers hire the Vessel described in Appendix A for the period as indicated in Box 9 from the time the Vessel is delivered to the Charterers.

(B) Charterers have the option, subject to Clause 7(D), to extend the Charter in direct continuation for the period as indicated in Box 10, but such an option must be declared 90 days prior to the expiry of the charter period.

2. Delivery

(A) Subject to Sub-Clause (B) of this Clause and to Clause 21 hereof, the Vessel shall be delivered by the Owners and accepted by the Charterers between the date indicated in Box 5 and the date indicated in Box 6 (the latter date being hereinafter referred to as "the cancelling date") at the port or place indicated in Box 7 in such available berth or mooring where the Vessel can safely lie always afloat, as the Charterers may direct. Owners not to be responsible for delay in delivery arising or resulting from strikes, lock-out or stoppage or restraint of labour whether partial or general.

*Mobilisation*

(B) (i) The Charterers shall pay a lump sum in the amount as stated in Box 15 without discount by way of mobilisation charge in consideration of Owners giving delivery at the port or place indicated in Box 16. This shall be payable 50 % at the commencement of the voyage to the delivery port, which portion shall be non-returnable Vessel lost or not lost, and the balance on safe arrival at the delivery port.

(ii) Should the Owners agree to the Vessel loading and transporting cargo and/or undertaking any other service for the Charterers en route to the port of delivery or from the port of re-delivery, then the terms, conditions and indemnities of this Charter Party shall apply to such loading and transporting and/or other service exactly as if performed during the period of the Charter excepting only that any lump sum freight agreed in respect thereof shall be payable on shipment or commencement of the service as the case may be, Vessel and/or goods lost or not lost.

*Cancelling*

(C) At any time, not later than seven days prior to the cancelling date indicated in Box 5, the Owners may give notice in writing to the Charterers that they will be unable to deliver the Vessel by the cancelling date but will deliver the Vessel by such date as may be specified in such notice. Charterers may within forty-eight hours of receipt of such notice give notice in writing to the Owners cancelling this Charter Party, in which event this Charter Party shall terminate on terms that neither party shall be liable to the other for any losses incurred by reason of the non-delivery of the Vessel or the cancellation of the Charter Party. If Charterers do not give such notice, then the later date specified in the Owners' notice shall be substituted for the cancelling date for all the purposes of this Charter Party.

3. Employment

(A) The Vessel shall be employed in lawful offshore activities restricted to the service(s) stated in Box 12, and on voyages between any good and safe port or place and any place or offshore unit where the Vessel can safely lie always afloat within the trading limits indicated in Box 11 which shall, in no circumstances, be exceeded without prior agreement and adjustment of the Charter Hire and such other terms as appropriate to be agreed and stated in Box 27. Provided always (i) That the Charterers do not warrant the safety of any such port or place or offshore units but shall act with prudence in their orders to the Vessel as if the Vessel were their own property and having regard to her capabilities and the nature of her employment. (ii) Charterers shall be responsible for any loss or damage sustained by the Vessel by reason of the condition of berth or offshore unit.

(B) Permission from responsible Authorities for Vessel and its Crew to work in the area defined in Clause 3(A) and Box 11, if required, shall be the responsibility of Charterers and Owners shall assist, if necessary, in every way possible to secure such permission.

4. Owners to Provide

(A) The Owners shall provide and pay for all provisions and wages, [illegible] of the Vessel, [illegible] deck and engineroom stores (except those which by the terms of this Charter Party are expressly payable by the Charterers) and the expense of maintaining the hull and machinery of the Vessel during her employment.

*Maintenance of Vessel*

(B) The Owners undertake that throughout the period under this Charter they will whenever the passage of time, wear and tear or any event may require, take all reasonable steps to maintain the Vessel in efficient state in hull and machinery or to restore the Vessel to such state, the Charterers agreeing to release the Vessel as necessary for this purpose in accordance with the provisions of Clause 11(C).

5. Charterers to Provide

The Charterers shall provide and pay for all fuel and lubricants and transport thereof (including auxiliary machinery and galley fuel), water, port charges, pilotage and boatmen (whether compulsory or not), canal steersmen (unless incurred in connection with the Owners' business), light dues, solid ballast, tug assistance, consular charges (except those appertaining to the Master, Officers and Crew), canal, dock and other dues and charges other than those of the nation of the Vessel's registry (including but not limited to social security charges on crew, any foreign general, municipality, income, or state taxes), dock, harbour and tonnage dues at the ports of delivery and re-delivery, agencies and commissions incurred on the Charterers' business, costs for security or other watchmen, expenses of fumigation (including derattisation and extermination of vermin), and of quarantine if occasioned by the nature of the cargo carried or the ports [illegible] offshore units or necessitated by any special requirements of [illegible] harbour authorities), and all ropes, slings and special runners (including bulk cargo discharge hoses) actually used for loading and discharging. Charterers shall further provide and pay for cust[oms] duties, permits, import duties, including cost involved in establish[ing] temporary or permanent importation bond(s), clearance expens[es] both for the Vessel and/or equipment, also special mooring [li]nes to offshore platforms, wires, nylons, spring lines, slings, etc., [used] for offshore works, all discharge hoses to supply platforms, [with] hose connections and adaptors, refill oxygene/acetylene bottles [and] supply electrodes used for offshore works.

6. Bunkers

Unless otherwise agreed, the Vessel shall be delivered with bunk[ers] and lubricants as on board and re-delivered with not less th[an] sufficient bunkers to reach the next bunkering stage en route [to] the Vessel's next port of call. The Charterers upon delivery and [the] Owners upon re-delivery shall take over and pay for the bunk[ers] and lubricants on board at the current contract installation pr[ice] at time and port of delivery and re-delivery.

7. Hire

(A) The Charterers shall pay as Hire for the Vessel at the rate sta[ted] in Box 13 per day or part thereof from the time that the Vessel [is] delivered to the Charterers until the expiration or earlier terminat[ion] of this Charter Party, such Hire being based on a complement [of] Master, Officers and Crew at prevailing rates of pay. Payment [of] Hire shall be made in cash in the manner prescribed in Box [14] without discount, every 30 days, in advance, the first payment to [be] made on the day of delivery of the Vessel to the Charterers. [In] default of payment, the Owners shall have the right of terminat[ing] this Charter and withdrawing the Vessel from the service of [the] Charterers, without being required to note any protest or to m[ake] any application to any court and without any other formality wh[at]soever and without prejudice to any claim the Owners may otherw[ise] have on the Charterers under the Charter. Should the Vessel be l[ost] or missing Hire shall cease from the date when she was lost [or if] the date of loss cannot be ascertained, half Hire shall be paid fr[om] the date the Vessel was last reported until the calculated date [of] arrival of the Vessel at her destination. Any Hire paid in advan[ce] shall be adjusted accordingly.

(B) The Owners shall be entitled to add 1 % per month interest [on] charter hire not received within 15 days of due payment as [per] Clause 7(A).

*Increase in Owners' Costs*

(C) In the event of any increase in the rates of pay of the Mast[er], Officers and the Crew (in accordance with officially negotiated ra[tes] of pay) taking effect after the date of this Charter Party the rate [of] Hire shall be increased according to the formula : Hn = Ho × (1 + 0.5 × P/100) (where Hn = hire rate after increase) (wh[ere] Ho = hire rate in force at time of wage increase) (where P = p[er]centage of aggregated cost increase in rates of pay, including [for] this purpose overtime, bonus, gratuity, leave, pension contributio[ns], social charges and taxes and all similar payments.)

(D) If the option under Sub-Clause 1(B) is exercised, hire to [be] negotiated between Owners and Charterers on the basis of the r[ate] mentioned in Box 13, but changes in Owners' expenses includ[ing] but not limited to salaries, wages and running costs to be ta[ken] into consideration.

8. Re-delivery

(A) The Vessel shall be re-delivered on the expiration or ear[lier] termination of this Charter Party, clear of cargo and in the sa[me] good order as when delivered to the Charterers (fair wear and t[ear] excepted) at the port or place stated in Box 8 or, if no place [is] named, at an ice-free place to be agreed between the Owners [and] the Charterers, and failing such agreement at the place of deliv[ery].

*Demobilisation*

(B) The Charterers shall pay a lump sum in the amount as stated [in] Box 17 by way of demobilisation charge which amount shall be p[aid] on the expiration or earlier termination of the Charter and shall [be] discountless and non-returnable Vessel lost or not lost.

(C) The Charterers shall give not less than the number of [days'] notice in writing of their intention to re-deliver the Vessel, as sta[ted] in Box 18.

*Early Termination of Charter*

(D) In the event that the Charterers abandon all operations wi[thin] the trading limits specified in Box 11 and at any time before [the] expiry of this Charter they may terminate this Charter by giving [not] less than the number of months' notice in writing as indicated [in] Box 20 to the Owners of their intention to so terminate and shall [pay] to the Owners upon such termination a sum equal to the number [of] months' hire as indicated in Box 19.

*Laying up of Vessel*

(E) The Charterers shall have the option of laying up the Vessel [for] all or any portion of the Charter period in which case the Hire he[re]under shall continue to be paid, but if the period of such lay[-up] exceeds 30 days they shall be credited against such hire the amo[unt] which the Owners shall have saved by reason of reduction in [ex]penses and overheads as a result of the lay-up of the Vessel dur[ing] so much of such period of lay-up as exceeds 30 days.

9. The Vessel's Space

The whole reach and burden and decks of the Vessel shall be [at] the Charterers' disposal reserving proper and sufficient space [for] the Vessel's Master, Officers, Crew, tackle, apparel, furniture, p[ro]visions and stores. The Charterers shall be entitled to carry, so [far] as space is available and for their purposes in connection with th[eir] operations and otherwise than for reward

"SUPPLYTIME" Uniform Time Charter Party for Offshore Service Vessels

(ii) Lawful cargo whether carried on or under deck.

(iii) Explosives and dangerous cargo provided such are packed and stowed in accordance with ship's national regulations and/or IMCO Dangerous Goods Code and/or other pertinent regulations. The Charterers accept responsibility for any additional expenses (including restoration expenses) incurred by the Owners in relation to the carriage of such cargo.

**10. Master and Crew**

(A) The Master shall carry out his duties promptly and the Vessel shall render all reasonable services within her capabilities by day and by night and at such times and on such schedules as the Charterers may reasonably require without any obligations of the Charterers to pay to the Owners or the Master, Officers or the Crew of the Vessel any excess or overtime payments. The Master shall be under the orders of the Charterers as regards employment, agency and other arrangements and the Charterers shall indemnify the Owners against all consequences or liabilities arising from compliance with such orders. The Charterers shall furnish the Master with all instructions and sailing directions and the Master and Engineer shall keep full and correct logs accessible to the Charterers or their agents. The Master shall sign cargo documents as and in the form presented, same, however, not to be Bills of Lading, but receipts which shall be non-negotiable documents and shall be marked as such. Charterers shall indemnify Owners against all consequences and liabilities arising from the Master, Officers or agents signing, under the direction of Charterers, those cargo documents or other documents inconsistent with this Charter Party or from any irregularity in the papers supplied by Charterers or their agents.

(B) The Vessel's Crew if required by Charterers will connect and disconnect electric cables, fuel, water and pneumatic hoses when placed on board the Vessel in port as well as alongside the offshore units; will operate the machinery on board the Vessel for loading and unloading cargoes; and will sling and hook on cargo when loading or discharging alongside offshore units. If the port regulations or the seamen and/or labour unions do not permit the Crew of the Vessel to carry out any of this work, then the Charterers shall make, at their own expense, whatever other arrangements may be necessary, always under the direction of the Master.

(C) If the Charterers have reason to be dissatisfied with the conduct of the Master or any Officer, Engineer or member of the Crew, the Owners and Master on receiving particulars of the complaint shall promptly investigate the matter and, if, in their opinion, it is necessary and practicable make a change in the appointment.

**11. Suspension of Hire**

(A) If as a result of any deficiency of Crew or Owners' stores, strike of Master, Officers and Crew, breakdown of machinery, damage to hull or other accident the Vessel is prevented from working for a period of more than 48 consecutive hours no Hire shall be payable in respect of time lost in excess of 48 hours and any Hire paid in advance shall be adjusted accordingly provided always however that Hire shall not cease in the event of the Vessel being prevented from working as aforesaid as a result of:

(i) the carriage of dangerous cargo;

(ii) quarantine or risk of quarantine unless caused by the Master, Officers or Crew having communication with the shore at any infected area not in connection with the employment of the Vessel and without the consent or the instructions of the Charterers;

(iii) deviation from her Charter duties or exposure to abnormal risks at the request of the Charterers;

(iv) Working alongside or in the proximity of any offshore unit, provided that there has been no gross dereliction of duty on the part of the Master, Officers or Crew of the Vessel;

(v) detention in consequence of being driven into port or to anchorage through stress of weather or trading to shallow harbours or to river or ports with bars or suffering an accident to her cargo, when the expenses resulting from such detention shall be for the Charterers' account howsoever incurred;

(vi) any act or omission of the Charterers, their servants or agents;

(vii) detention or damage by ice.

*Liability for Vessel not Working*

(B) The Owners shall be under no liability whatsoever to the Charterers for any loss, damage or delay sustained by Charterers as a result of the Vessel being prevented from working by any cause whatsoever other than the Owners' failure to comply with their obligation to make the Vessel seaworthy and fit for her duties in accordance with this Charter when such liability shall be limited as provided under Clause 15(A).

*Drydocking*

(C) The Vessel shall be drydocked at regular intervals to be mutually agreed and all expenses including port charges incurred and fuel consumed during the drydocking period to be for Owners' account. Charterers shall place the vessel at Owners' disposal clear of cargo at the port or place named in Box 23 or at the nearest port suitable for the purpose. The Vessel shall be off-hire, unless the full time allowed in Clause 11(D) is not used, from the time of arrival at the drydocking port when clear of cargo and shall remain off-hire until ready to resume Charterers' service at the place at which the off-hire period commenced.

*Repairs and Maintenance*

(D) Notwithstanding the foregoing provisions of this Clause, Charterers shall grant Owners a maximum of 24 hours on hire, which shall be cumulative, per month or pro rata for part of a month from the commencement of the Charter period until the final redelivery of the Vessel for maintenance and repairs including drydocking connected with Owners' duties under Clause 6(B). Any accumulated time for drydocking, maintenance and repairs saved but not used shall be payable by Charterers annually and any balance upon redelivery at the then prevailing daily Hire.

**13. Excluded Ports**

(A) The Vessel not to be ordered to nor bound to enter without the Owners' written permission (a) any place where fever or epidemics are prevalent or to which the Master, Officers and Crew by law are not bound to follow the Vessel; (b) any ice-bound place or any place where lights, lightships, marks and buoys are or are likely to be withdrawn by reason of ice on the Vessel's arrival or where there is risk that ordinarily the Vessel will not be able on account of ice to reach the place or to get out after having completed her operations. The Vessel shall not be obliged to force ice nor to follow icebreaker. If, on account of ice, the Master considers it dangerous to remain at the loading or discharging place for fear of the Vessel being frozen in and/or damaged, he has liberty to sail to a convenient open place and await the Charterers' fresh instructions.

(B) If the Vessel shall with or without the Owners' permission enter any such place as is mentioned under Sub-Clause(A) of this Clause the Charterers shall be responsible for and shall hold harmless and indemnify the Owners from and against all loss of and damage and delay to the Vessel and to the Owners and all loss of life and personal injuries to the Owners' Master, Crew, servants and others in the Vessel giving rise to legal liability on Owners' part howsoever the same may arise or result from entering such place.

**14. Towage, Anchor Handling**

(A) On delivery the Vessel shall be equipped at Owners' expense with equipment described in Appendix B. If during the Charter period such equipment become(s) damaged and unserviceable during operations a replacement shall be provided by Charterers at their expense.

(B) All towage performed by the Vessel for the Charterers shall be subject to the United Kingdom Standard Towing Conditions.

**15. Owners' Responsibilities and Exceptions**

(A) The Owners shall be liable to the Charterers for any loss or damage incurred by the Charterers by reason of a want of due diligence by the Owners in making the Vessel seaworthy and fit for her duties under the Charter, but the Owners' liability in respect of any non-performance by the Vessel of her duties under the Charter shall be limited to suspension of Hire. The Owners shall not be liable to the Charterers or Charterers' Contractors in respect of:

(i) any loss of life, injury, loss or damage to any passenger or other person (not being the Master or an Officer or member of the Crew of the Vessel) on board the Vessel at the request or with the knowledge or consent of the Charterers or any loss or damage to cargo howsoever caused notwithstanding that such loss of life, injury, loss or damage is due to any act or omission of the Master or any Officer or member of the Crew of the Vessel; or

(ii) any loss or damage to offshore units whether direct or indirect and including, but not restricted to, any consequential loss; or

(iii) any actual or potential spill, seepage and/or emission of any pollutant occurring within the offshore site and any pollution resulting therefrom, wheresoever it may occur;

(iv) any loss of life, injury, loss or damage to any person on or in the vicinity of offshore units unless due solely to a negligent act or omission of the Master or any Officer or member of the Crew of the Vessel only in the course of or in relation to work which would normally be done by the Vessel's Crew;

(v) loss, damage or delay arising or resulting from strikes, lock-outs, or stoppages or restraint of labour (including the Master, Officers and Crew) whether partial or general.

*Charterers' Responsibilities*

(B) The Charterers shall be responsible for loss or damage caused to the Vessel or to the Owners:

(i) by goods being loaded contrary to the terms of the Charter or by improper or careless bunkering or loading, stowing or discharging of goods;

(ii) by any improper or negligent act or omission on their part or that of their servants or agents;

(iii) by improper or negligent act or omission of any passenger, member of the crew of an offshore unit or other person (not being the Master or an Officer or a member of the Vessel's Crew) on board the Vessel at the request of or with the knowledge or consent of the Charterers;

(iv) by reason of any actual or potential spill, seepage and or emission of any pollutant occurring within the offshore site and any pollution resulting therefrom, wheresoever it may occur and including but not limited to the cost of such measures as are reasonably necessary to prevent or mitigate pollution damage.

*Charterers' Indemnities*

(C) The Charterers shall indemnify the Owners against any liability (including cost and expense) in respect of any loss of life, injury, damage or other loss to person or property, howsoever caused, even if caused by the neglect or fault of Owners' servants or agents, to:

(i) any third party owning or having an interest in an offshore unit;

(ii) any third party in respect of cargo carried by the Vessel;

(iii) any third party arising by reason of any actual or potential spill, seepage and/or emission of any pollutant howsoever caused occurring within the offshore site and any pollution resulting therefrom, wheresoever it may occur;

(iv) any passenger or other person (not being the Master or any Officer or a member of the Vessel's Crew) on board the Vessel at the request or with the knowledge or consent of the Charterers;

(v) any other person in the vicinity of an offshore unit provided always that the provisions of this Charter shall not be read as in any way diminishing any of the Charterers' liabilities in their capacity as owners or hirers of such offshore unit or in any capacity other than that of the Charterers of the Vessel.

*Liability on Master, Officers and Crew*

(D) The Master, Officers and Crew of the Vessel shall in no circum-

Case 3:16-bk-02230-PMG Doc 73-1 Filed 03/06/16 Page 5 of 19

to the Owners or to which the Owners are entitled hereunder shall also be available and shall extend to protect the Master and Crew of the Vessel acting as aforesaid. For the purpose of this Clause the Owners are or shall be deemed to be acting as agent on behalf of and for the benefit of the Master and Crew of the Vessel who shall to this extent be or be deemed to be parties to the contract contained under this Charter Party, and the Charterers agree not to institute any proceedings against them in respect of any such matters.

**16. Deviation to Assist**

The Vessel shall be entitled at all times to assist vessels and other property in distress, to deviate for the purpose of saving life or property and for that purpose to call at any port or ports for fuel and or other supplies and to carry cargo on or under deck.

**17. Salvage**

Subject to the provisions contained in Clause 18, all salvage and assistance to other vessels shall be for the Owners' and the Charterers' equal benefit after deducting the Master's and Crew's proportion and all legal and other expenses including hire paid under the Charter for time lost in the salvage, repairs of damage and oil consumed. The Charterers shall be bound by all measures taken by the Owners in order to secure payment of salvage and fix its amount. Charterers agree and if within their control shall so arrange that all salvage assistance unless alternative terms be agreed with Owners, shall be on terms of Lloyd's Open Form "No cure — no pay".

**18. Assistance to Charterers' Offshore Units**

Notwithstanding any other provisions contained in this Charter, if the Owners consent to assist any offshore unit in distress owned by or contracted to the Charterers on the basis of "no claim for salvage", then, even in the event of neglect or default of Master, Officers or Crew:

(i) Charterers shall be responsible for and shall indemnify the Owners against payments made under any legal rights to the Master and Crew in relation to such assistance.

(ii) Charterers shall be responsible for and shall reimburse the Owners for any loss or damage sustained by the Vessel or her equipment by reason of giving such assistance and shall also pay the Owners' expenses.

(iii) Charterers shall be responsible for any actual or potential spill, seepage and/or emission of any pollutant howsoever caused occurring within the offshore site and any pollution resulting therefrom, wheresoever it may occur and including but not limited to the cost of such measures as are reasonably necessary to prevent or mitigate pollution damage and Charterers shall indemnify Owners against any liability, cost or expense arising by reason of such actual or potential spill, seepage and/or emission.

(iv) The Vessel shall not be off-hire as a consequence of giving such assistance, or effecting repairs under sub-paragraph (ii) of this Clause and time taken for such repairs shall not count against time granted under Sub-Clause (D) of Clause 11.

(v) Charterers shall indemnify the Owners against any liability, cost and or expense in respect of any loss of life, injury, damage or other loss to person or property caused by such assistance.

**19. Lien**

The Owners shall have a lien upon all cargoes for all claims against the Charterers under this Charter and the Charterers shall have a lien on the Vessel for all monies paid in advance and not earned. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners in the Vessel. Charterers shall indemnify and hold Owners harmless against any lien of whatsoever nature arising upon the Vessel during the Charter period while she is under the control of Charterers, and against any claims against Owners arising out of the operation of the Vessel by Charterers or out of any neglect of Charterers in relation to the Vessel or the operation thereof. Should the Vessel be arrested by reason of claims or liens arising out of her operation hereunder by Charterers, Charterers shall at their own expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their own expense put up bail to secure release of the Vessel.

**20. Sub-let**

(A) The Charterers shall have the option of sub-letting the Vessel to any person or company not competing with the Owners, subject to the Owners' prior approval which shall not be unreasonably withheld, upon giving notice in writing to the Owners, but the original Charterers shall always remain responsible to the Owners for due performance of the Charter and contractors of the person or company taking such subletting shall be deemed Contractors of the Charterers for all the purposes of this Charter Party. The Owners make it a condition of such consent that additional hire shall be paid as agreed between Charterers and Owners having regard to the nature of and any additional hazards of any intended service of the Vessel.

(B) If the Vessel is sub-let or loaned to undertake rig anchor handling and or towing operations connected with equipment, other than that used by the Charterers, then a daily increment to the Charter hire in the amount stated in Box 25 or pro rata shall be paid for the period between departure for such operations until return to her normal duties for the Charterers.

**21. Substitute Vessel**

The Owners shall be entitled at any time, whether before the cancelling date or at any other time during the Charter period, to substitute for the Vessel named in Box 4 another Vessel of equivalent Capability and capacity.

**22. War**

(A) The Vessel unless the consent of the Owners be first obtaine not to be ordered nor continue to any place or on any voyage no be used on any service which will bring her within a zone which dangerous as the result of any actual or threatened act of war, wa hostilities, warlike operations, acts of piracy or of hostility or mali cious damage against this or any other vessel or its cargo by an person, body or State whatsoever, revolution, civil war, civil com motion or the operation of international law, nor be exposed in an way to any risks or penalties whatsoever consequent upon the im position of Sanctions, nor carry any goods that may in any wa expose her to any risks of seizure, capture, penalties or any othe interference of any kind whatsoever by the belligerent or fightin powers or parties or by any Government or Ruler.

(B) Should the Vessel approach or be brought or ordered withi such zone, or be exposed in any way to the said risks, (1) the Owner to be entitled from time to time to insure their interests in the Vess and/or hire against any of the risks likely to be involved thereby o such terms as they shall think fit, the Charterers to make a refun to the Owners of the premium on demand; and (2) notwithstandin the terms of Clause 11 hire to be paid for all time lost including an lost owing to loss of or injury to the Master, Officers or Crew or t the action of the Crew in refusing to proceed to such zone or to b exposed to such risks.

*(C) In the event of the wages of the Master, Officers and or Cre or the cost of provisions and or stores for deck and or engine roo and/or insurance premiums being increased by reason of or durin the existence of any of the matters mentioned in Sub-Clause (A) th amount of any increase to be added to the hire, and paid by th Charterers on production of the Owners' account therefor suc account being rendered monthly.

(D) The Vessel to have liberty to comply with any orders or direction as to departure, arrival, routes, ports of call, stoppages, destinatio delivery or in any other wise whatsoever given by the Governme of the nation under whose flag the Vessel sails or any other Govern ment or any person (or body) acting or purporting to act with th authority of such Government or by any committee or person havin under the terms of the war risks insurance on the Vessel the righ to give any such orders or directions.

(E) In the event of the nation under whose flag the Vessel sails be coming involved in war, hostilities, warlike operations, revolution o civil commotion, and if as a result thereof the Vessel is prevente from carrying out her duties under this Charter Party, both the Owner and the Charterers may cancel the Charter and, unless otherwis agreed, the Vessel to be redelivered to the Owners at the port o destination or, if prevented through the provisions of Sub-Clause (A from reaching or entering it, then at a near open and safe port a the Owners' option, after discharge of any cargo on board.

(F) If in compliance with the provisions of this Clause anything i done or is not done, such not to be deemed a deviation.

** Sub-Clause (C) is optional and should be considered deleted unles agreed according to Box 21.*

**23. General Average**

General Average to be adjusted according to York Antwerp Rules 1974. Hire not to contribute to General Average.

**24. Both-to-Blame Collision Clause**

If the Vessel comes into collision with another ship as a result of th negligence of the other ship and any act, neglect or default of th Master, mariner, pilot or the servants of the Owners in the navigatio or the management of the Vessel, the Charterers will indemnify th Owners against all loss or liability to the other or non-carrying shi or her owners in so far as such loss or liability represent loss of o damage to, or any claim whatsoever of the owners of any good carried under this Charter paid or payable by the other or non carrying ship or her owners to the owners of the said goods an set-off, recouped or recovered by the other or non-carrying ship o her owners as part of their claim against the Vessel or the Owners The foregoing provisions shall also apply where the owners, oper ators or those in charge of any ship or ships or objects other than o in addition to the colliding ships or objects are at fault in respec of a collision or contact.

**25. Structural Alterations**

The Charterers shall have the option of making at their expens structural alterations to the Vessel with the written consent of th Owners but unless otherwise agreed the Vessel is to be re-delivere re-instated to her original condition. The Vessel is to remain on hir during any period of these alterations or re-instatement. The Owner shall in no way be responsible for any consequences arising out o the Charterers carrying out any such alteration or re-instatement.

**26. Definitions**

"Offshore unit" is defined for the purposes of this Charter as a vessel, offshore installation, structure and or mobile unit used offshore exploration, exploitation or production.
"Offshore site" is defined for the purposes of this Charter as th area within three nautical miles of an offshore unit from or to whic the Owners are requested to take their Vessel by the Charterers.

**27. Arbitration**

This Charter Party shall be governed by English law and any disput arising under this Charter shall be referred to arbitration in Londo [illegible] (or such other place as may be agreed according to Box [illegible]) on Arbitrator to be nominated by the Owners and the other by th Charterers, and in case the Arbitrators shall not agree then to th decision of an Umpire to be appointed by them, the award of th Arbitrators or the Umpire to be final and binding upon both parties

Maintenance of Vessel

(B) The Owners undertake that throughout the period under this Charter they will take all reasonable steps to maintain the Vessel in efficient state in hull and machinery or to restore the Vessel to such state.

(C) The Owners shall further provide and pay for all fuel and lubricants and transport thereof (including auxiliary machinery and galley fuel), water, port charges, pilotage and boatmen (whether compulsory or not) canal steersmen, light dues, solid ballast, tug assistance, consular charges, canal, dock and other dues and charges, dock, harbour and tonnage dues at the ports of delivery and re-delivery, agencies and commissions costs for security or other watchmen, expenses of fumigation (including de-ratisation and extermination of vermin) and of quarantine (if occasioned by the nature of the cargo carried or the port visited whilst employed under this Charter). The Owners shall also provide and pay for the loading and unloading of cargoes except the objects covered by clause 21 and for all necessary dunnage, uprights and shoring equipment for securing deck cargo, all cordage (excluding such as is required for ordinary ship's purposes, mooring alongside in harbour but including such as is required for securing to the offshore units or necessitated by any special requirements of the harbour authorities), and all ropes, slings and special runners (including bulk cargo discharge hoses) actually used for loading and discharging. Owners shall further provide and pay for custom duties, permits, import duties, including costs involved in establishing temporary or permanent importation bond(s), clearance expenses both for the Vessel and/or equipment except in respect of the objects covered by clause 21, also special mooring lines to offshore platforms, wires, nylons, spring lines, slings etc...used for offhsore works with hose connections and adaptors, refill oxygene/acetylene bottles and supply electrodes for offshore works.

5. BUNKERS AND LUBRICANTS

The owners shall be responsible for providing and paying for all bunkers and lubricants.

6. RE-DELIVERY

The Vessel shall be re-delivered on the expiration of this Charter-Party;

.../...



Case 3:15-bk-02230-PMG Doc 73-1 Filed 03/23/16 Page 7 of 19

7. THE VESSEL'S SPACE

The whole reach and burden and decks of the Vessel shall be at the Charterer's disposal reserving proper and sufficient space for the Vessel's Master, Officers, Crew, tackle, apparel, furniture, provisions and stores. The Charterers shall be entitled to carry, so far as space is available and for their purposes in connection with their operations :

(i) Passengers including T.V.and filming crews, and for such purposes to make use of the Vessel's available accommodation not being used on the voyage by the Vessel and Crew. The Owners shall provide suitable provisions and requisites for such passengers.

(ii) Lawful cargo whether carried on or under deck.

(iii) Explosives and dangerous cargo provided such are packed and stowed in accordance with ship's national regulations and/or IMCO Dangerous Goods Code and/or other pertinent regulations. The Charterers accept responsibility for any additional expenses (including restoration expenses) incurred by the Owners in relation to the carriage of such cargo.

(iv) The OWNERS shall permit passengers including film or T.V. personnel to travel aboard "Nautile" but those passengers will be carried at their own risk and subject to satisfactory medical assessment.

8. MASTER AND CREW

(A) The Master shall carry out his duties promptly and the Vessel shall render all reasonable services within her capabilities by day and by night and at such time and on schedules as the Charterers may reasonably require without any obligations of the Charterers to pay to the Owners or the Master, Officers or the Crew of the Vessel any excess or overtime payments. Subject to article 18.2. hereafter, the Master shall be under the orders of the Charterers as regards employment, agency and other arrangements. The Master and Engineer shall keep full and correct logs accessible to the Charterers or their agents. The Master shall sign cargo documents as and in the form presented.

(B) If the Charterers have reason to be dissatisfied with the conduct of the Master or any Officer, Engineer or member of the Crew, the Owners and Master on receiving particulars of the complaint shall promptly investigate the matter and, if, in their opinion, it is necessary and practicable make a change in the appointment.

.../...



For the purpose of this clause, the Charterers shall deal solely with the Owners Senior Representative at sea and the Owners will implement the Charterers wishes in respect of the Master, Engineer and Crew in relation to this clause.

9. DEVIATION TO ASSIST

The Vessel shall be entitled at all times to assist vessels and other property in distress, to deviate for the purpose of saving life or property and for that purpose to call at any port or ports for fuel and/or other supplies and to carry cargo on or under deck. Such deviation shall be considered as a period of hire.

10. SALVAGE

All salvage (other than is contemplated by and arises from the activities described in Box 12) and assistance to other vessels shall be for the Owners' and the Charterers' equal benefit after deducting the Master's and Crew's proportion and all legal and other expenses including hire paid under the Charter for time lost in the salvage, repairs of damage and oil consumed. The Charterers shall be bound by all measures taken by the Owners in order to secure payment of salvage and fix its amount. Charterers agree and if within their control shall so arrange that all salvage assistance unless alternative terms be agreed with Owners, shall be on terms of LLoyd's Open Form "No cure-no pay".

The Owners shall indemnify and hold harmless the Charterers from any claim for salvage made by the Master, any crew servant or agent of the Owner.

If any conflict arises between this clause and clause 21 then the latter shall prevail.

11. LIEN

The Owners shall have a lien upon all cargoes for all claims against the Charterers under this Charter and the Charterers shall have a lien on the Vessel for all monies paid in advance and not earned. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners in the Vessel.

.../...



Charterers shall indemnify and hold Owners harmless against any lien or whatsoever nature arising upon the Vessel during the Charter period while she is under the control of Charterers, and against any claims against Owners arising out of the operation of the Vessel by Charterers or out of any neglect of Charterers in relation to the Vessel or the operation thereof. Should the Vessel be arrested by reason of claims or liens arising out of her operation hereunder by Charterers, Charterers shall at their own expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their own expense put up bail to secure release of the Vessel.

12. SUB-LET

Subject to the prior written approval of the OWNERS, the Charterers shall be authorized of sub-letting the vessel to any person or company not competing with the Owners.

13. WAR

(A) The Vessel unless the consent of the Owners be first obtained not to be ordered nor continue to any place or on any voyage nor be used on any service which will bring her within a zone which is dangerous as the result of any actual or threatened act of war, war, hostilites, warlike operations, acts of piracy or of hostility or malicious damage against this or any other vessel or its cargo by any person, body or State whatsoever, revolution, civil war, civil commotion or the operation of international law, nor be exposed in any way to any risks or penalties whatsoever consequent upon the imposition of sanctions.

.../...

(B) If as a result of such aforementioned acts or warlike operations the Vessel is prevented from carrying out her duties under this Charter Party, both the Owners and the Charterers may cancel the Charter and, unless otherwise agreed, the Vessel to be redelivered to the Owners in port of re-delivery defined in box 8.

The Owners shall not be liable for the consequences of such early termination of the charter and the total charter hire defined in box 13 shall be paid to the Owners.

14. GENERAL AVERAGE

General Average to be adjusted according to York/Antwerp Rules, 1974. Hire not to contribute to General Average.

15. BOTH-TO-BLAME COLLISION CLAUSE

If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owners in the navigation or the management of the Vessel, the Charterers will indemnify the Owners against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represent loss of or damage to, or any claim whatsoever of the owners of any goods carried under this Charter paid or payable by the other or non-carrying ship or her owners to the owners of the said goods and set-off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the Vessel or the Owners. The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than or in addition to the colliding ships or objects are at fault in respect of a collision or contact.

16. STRUCTURAL ALTERATIONS

The Charterers shall have the option of making at their expense structural alterations to the Vessel with the written consent of the Owners but unless otherwise agreed the Vessel is to be re-delivered re-instated to her original condition. The Vessel is to remain on hire during any period of these alterations or re-instatement.

.../...

17. ARBITRATION

Any dispute arising under this Charter which cannot be settled in an amicable manner shall be referred to arbitration in London according to the rules and regulations of the International Chamber of Commerce of LONDON.

This Charter Party shall be governed by English law.

18. POSITION OF TITANIC WRECK

Owners warrant that they have accurate knowledge of the exact position of the "TITANIC" wreck and undertake to bring the vessel to such position and to dive their submersible on the TITANIC site (as defined in Clause 19..Owners undertake to supply the TITANIC's accurate position to the charterer. The charterer will not unnecessarily divulge the position of the TITANIC WRECK to any third party.

19. DEFINITION OF THE SITE

"THE SITE" is :

1. The bow and stern sections of "RMS TITANIC".

2. The area which lies half a nautical mile to either side of the line from the front of the bow section to the rear of the stern section, extended one nautical mile to the rear of the stern section.

20. RECOVERY OF OBJECTS

20.1. OWNERS will forthwith hand over to the Charterers all objects collected on or from the Titanic site during the performance of this charter party. OWNERS renounce all property rights in the objects collected during the expedition performed under this charter party, both for themselves and on behalf of the Master, Officers, crew, servants and agents, provided all payments defined in article 24 be made to the OWNERS.
In particular, the Charterers may only keep the safes if the corresponding term of payment is made to IFREMER.

20.2. Owing to the fact that the objects collected by OWNERS on behalf of the Charterers are not the property of OWNERS, the Charterers shall indemnify and hold harmless OWNERS against all and any claim related to the recovery of the aforementioned objects excepting always any claims made by any master, crew, agents servants or employees of OWNERS.

.../...



Charterers shall reimburse OWNERS of all legal expenses incurred by OWNERS in connection with such claims.

Charterers shall not sell the objects collected by OWNERS, but shall use them only for exhibition purpose.

20.3 OWNERS shall not be responsible for the process of conditioning and preservation of these objects on board the vessel.

20.4 OWNERS shall be entitled to collect a few specific samples of the Titanic wreck for scientific experimental purposes in corrosion research and/or biological research.

The selection of samples and the collection of the same shall be mutually agreed between the representative of OWNERS and of the Charterers on the vessel and the collection of these samples shall in no way interfere with the Charterers use of the vessel.

21. AUDIO VISUAL RIGHTS AND OTHER COMMERCIAL RIGHTS

21.1. The charterer shall at all times have and be entitled to the benefit of all media, T.V., audio-visual rights relating to and arising from the activities of the charter.

21.2. All logos appearing on the vessel will remain as they are and where they are, nevertheless the charterers shall have the right to place such additional logos as they wish on the vessel and/or ancillary equipement in such a position as they wish, provided that such positioning shall not interefere with the operation of the vessel or any part of it or obscure any of OWNERS or other logos or names currently on the "vessel" and its ancillary equipements.

21.3. - Merchandising arrangements for toys and models

Subject to the provisions of this section the Charterers shall retain and be entitled to the benefit of all merchandising and other commercial rights relating to and arising from the activities of the Charter. The Charterers shall be fully entitled to authorize and licence the production of models, toys and all representations of the vessels and equipment used by IFREMER for the purpose of the Charter Party ("the vessels and the equipment") for merchandising and commercial gain in connection with the 1987 TITANIC Expedition.

.../...



IFREMER shall be entitled to receive 5% of the whole sale turnover of the sales of toys and models representing IFREMER's equipment.

After 31st August 1992, the Charterers will not, without the prior written consent of the Owners, enter into new contracts for the licensing of the merchandising, production and sale of the toys, but all contracts entered into by the Charterers prior to that date shall be allowed to run to expiry.

21.4. The charterers shall keep OWNERS informed of preparations for any film or book relating to the RMS TITANIC expeditions or to the TITANIC site.

22. FUTURE EXPEDITIONS ON THE TITANIC SITE

22.1. In the event that the charterer intends to plan additional expeditions to the TITANIC site during the years 1988 to 1992 inclusive the charterer shall inform OWNERS of its intentions before the 31st January of the year during which the expedition will take place.

22.2. In the event IFREMER will be approached during the years 1988 to 1992 by a new entity in order to perform similar expeditions on the TITANIC site, IFREMER shall grant a first refusal right to the CHARTERER in order to allow him to participate in a new TITANIC expedition.

The first refusal right has to be exercised by the CHARTERER within three weeks after notice given in writing by IFREMER.

23. LIABILITY

23.1. OWNERS warrant that the vessel is seaworthy and fit in all aspects for her duties under this charter.

23.2. The navigation management and operation of the vessel, the diving operations and the overall safety of the vessel and all loss damages costs expenses and liabilities arising out of or connected therewith shall be the sole responsibility of the OWNERS.

.../...



SENT BY:Xerox Telecopier 7020 ; Case 3:16-ap-00183-PMG Doc 1-1 Filed 08/17/16 Page 14 of 19 ;#12

OWNERS shall be solely liable for all loss damages expense and claims for death or for personal injury to any Master, crew, servant, agent or employee of OWNERS or any other person on board the vessel at their request and for all damage or loss caused to or incurred by the vessel or other property of OWNERS or OWNERS itself arising out of or in any way connected with the performance of the work at sea or sub-sea under this agreement, howsoever caused. Subject to sub-Clause 23.3. hereof OWNERS shall be liable for all loss damage expense or costs suffered or incurred in connection with claims made by third parties excepting the journalists, T.V. companies and all persons invited on board by the charterers and OWNERS shall indemnify and hold harmless the charterers from all claims for such losses, damage, expenses, costs.

Nothing in this clause or in the charter-party as a whole may be regarded as transfering the aforesaid responsibilities and liabilities to the Charterers.

OWNERS shall not however be liable for loss or damage caused to the objects from the wreck of RMS TITANIC from the time of correction or recovery by OWNERS until such objects are handed over to the Charterers pursuant to clause 20.1.

23.3. The Charterers shall be solely liable for all loss damages expense and claims for death or for personal injury to any passenger or other person (not being the Master, crew servant agent or employee of OWNERS) on board the vessel at their request or with the knowledge or consent of the Charterers. The charterers shall be responsible for all loss or damage to objects from the wreck of RMS TITANIC after they are handed over by OWNERS. For the avoidance of doubt the charterers and his insurance companies waive any right to sue the OWNERS in respect of all matters covered by this paragraph.

23.4. The Owners shall not be held liable for any delay caused by a strike by persons other the Owners own employees or agents.

ARTICLE 24 - CONDITIONS OF PAYMENT

24.1. The global charter hire for the basis charter period (54 days), subject to the option arrangement described in paragraph 24.2 below, shall be a lump sum of French francs 8,610,000 (eight million six hundred ten thousand francs) plus French francs 3,690,000 (three million six hundred ninety thousand French francs) for the recovery of the first TITANIC safe, plus French francs 615 000 (six hundred and fifteen thousand French francs) for each of the two additional TITANIC safes.

.../...



The global charter hire for the basis charter period (54 days) shall be paid as follows :

a/ The charterers shall issue by July 3, 1987 an irrevocable letter of credit in favour of IFREMER, Account nr 2335 A

CREDIT LYONNAIS, Agence Ligne Entreprises
75008 - PARIS, 55 Champs Elysées
Telex 660 021 F

with following condition of payments :

- FF 1,291,500 payable by July 3, 1987
- FF 2,000,000 payable on reception of a telex issued by IFREMER confirming the departure of the NADIR VESSEL from TOULON for the TITANIC SITE,
- FF 2,000,000 payable on reception of a telex issued by IFREMER confirming that the first NAUTILE dive takes place on the TITANIC SITE,
- FF 2,000,000 payable thirty days after the date of the first NAUTILE DIVE on the TITANIC SITE.
- FF 1.318.500 payable on September 30, 1987 upon presentation of an invoice by IFREMER.

b/ The Charterers shall issue an irrevocable letter of credit in favour of IFREMER account defined in paragraph a of FF 3,690,000 for the recovery of the first TITANIC SAFE.

This letter of credit has to be issued by the Charterers no later than 48 hours after recovery of the safe notified to the charterers by telex sent by IFREMER.

The FF 3,690,000 shall be payable on September 30, 1987 upon presentation of an invoice by IFREMER.

c/ The Charterers shall issue an irrevocable letter of credit in f[illegible]r of IFREMER account defined in paragraph a of FF 615,000 for the [illegible]covery of each ot the two additional TITANIC SAFES.

These letters of credit have to be issued by the Charterers no later than 48 hours after recovery of the safe notified to the charterers by telex sent by IFREMER.

The FF 615,000 shall be payable for each two additional safes recovered on November 30, 1987 upon presentation of an invoice by IFREMER.

.../...

4

Appendix "A" to the Charter Party

Name of Vessel : NADIR

Support vessel for underwater research

- main characteristics :

| | |
|---|---|
| class of vessel | : BV + 1 - 3 ~ .3 E (haute mer) Glace III |
| length overall | : 55,75 m |
| beam overall | : 11,89 m |
| draught max. | : 4,68 m |
| depth moulded | : 5,50 m at main deck |
| displacement | : 2 025 tons |
| deck cargo | : 360 tons |
| deck area | : 33 m x 11 m |
| deadweigh | : 1 173 tons |

main propulsion :

. four engines, total output 2 400 HP
. two engines on each controllable pitch propeller
. auxiliary propulsion : gill jet bow thruster 420 HP
. electrical power 970 KVA
380 V 50 HZ 3 phases

- Equipment

Satellite navigation system
Telephone - telex by INMARSAT

- facilities for carrying Nautile
  - one special stern gantry (20 tons)
  - one rolling platform for transfering the submersible to the workshop

- facilities for carrying major surface equipment
  - one main crane (3 tons at 14,7m)

- laboratory containers (20')

- accommodation:officers and men 14

- technical personal : 15

- passengers : 10

INSTITUT FRANÇAIS DE RECHERCHE POUR L'EXPLOITATION DE LA MER
[illegible]
75... PARIS
TÉL. [illegible]
[illegible]

P [illegible]

Appendix "B" to the Charter Party
Particulars of vessel's equipment

NAUTILE

manned submersible

| | |
|---|---|
| depth rating | 6 000 m |
| weight in air | 18, 5 T |
| length | 8,00 m |
| width | 2,70 m |
| heigth | 3,45 m |
| pay-load | 200 kg |

manned sphere

- crew 3
- inside diameter 2,10 m
- sphere material titanium allog
- view posts
  - number 3
  - diameter 120 mm

pitch and trim control with mercury pump 12°

power system : Ni-Cd battery 40 Kwh

propulsion : 1 axial motor
2 vertical thrusters
1 lateral thruster
highspeed 2,5 knots
underwater range at 1 knot : 15 miles

autonomy
safety 130 hours

telemanipulation

- 2 arms

communications

- 1 underwater telephone
- 1 acoustic broadcast system for still pictures

miscellaneous equipments

- 1 scanning sonar
- 1 TV camera 3CCD.
- 2 photo cameras
- 6 extern lights
- 1 sub bottom profiler
- 1 dead reckoning

A navis positionning system will be supplied to position Nautile and Nadir on the seabed

INSTITUT FRANÇAIS DE RECHERCHE
POUR L'EXPLOITATION DE LA MER
66, Avenue d'Iéna
75116 PARIS
TÉL. [illegible]
720.55.01

.../...

Appendix "B" to the Charter Party
Particulars of vessel's equipment

R.O.V. ROBIN

- tethered remote operated vehicle powered and controlled from the Nautile
- located at the lower front end of the Nautile when not in operation.

max. operating depths 6 000 m

neutral umbilical length 70 m
weight 130 kg

dimensions L 0,67 m
W 0,70 m
H 0,55 m

forward speed up to 1 knot

propulsion 4 oil filled electrical thrusters
(5 kg thrust each)

sensors - low drift gyro
- high accuracy pressure sensor

auto heading and auto depth capability

light 2 x 250 W quartz iodide
1 x 100 W quartz iodide

television 1 colour low ligth
2 black and white
still picture camera (option)

flash head 100 j

emergency locator flashes

telemetry MUX date and video

INSTITUT FRANÇAIS DE RECHERCHE
POUR L'EXPLOITATION DE LA MER
66, Avenue d'Iéna
75116 PARIS
TÉL. 723.55.28
720.63.01

Appendix "B" to the Charter Party
Particulars of vessel's equipment

Autonomous shuttle

5 made of 1,2 x 1,2 x 1,5 basket fitted with acoustic release system will be supplied.

For safety reasons these shuttles have to be lowered down prior to the Nautile's dive.